Patrick CHAVIS et al., Plaintiffs,

v.

Edgar D. WHITCOMB, Governor
of Indiana, Defendant.

No. IP 69–C–23.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Nov. 21, 1972.

James Manahan, Indianapolis, Ind., for plaintiffs.

Theodore L. Sendak, Atty. Gen., Indianapolis, Ind., for defendant.

Before CUMMINGS, Circuit Judge, and STECKLER and NOLAND, District Judges.

## ENTRY ON DEFENDANT'S MOTION TO DISMISS; DAVID GRINDSTAFF'S PETITION TO INTERVENE; DEFENDANT'S MOTION TO STRIKE

PER CURIAM.

The Supreme Court of the United States reversed the judgment of this court, 305 F.Supp. 1364; 307 F.Supp. 1362, and remanded the case for further proceedings consistent with its opinion, 403 U.S. 124, 91 S.Ct. 1858, 29 L. Ed.2d 363 (1971); the above-entitled matters then came before this court on the motions of the defendant, Edgar D. Whitcomb, Governor of Indiana and Chairman of the State Election Board, to dismiss and to strike, and on the petition of David Grindstaff to intervene.

This suit was originally brought by residents of Marion and Lake Counties, Indiana, challenging state statutes establishing Marion County as a multi-member district for the election of state senators and representatives. It was alleged, first, that the laws invidiously diluted the votes of Negroes and poor persons living in the "ghetto area" of Marion County, and second, that voters in multi-member districts were over-represented since the true test of voting power is the ability to cast a tie-breaking vote, and the voters in multi-member districts had a greater theoretical opportunity to cast such votes than voters in single-member districts. The tendency of multi-member district legislators to vote as a bloc was alleged to compound this discrimination. This court determined that a racial minority group with specific legislative interests inhabited a ghetto area in Indianapolis, in Marion County; that the statutes operated to minimize and cancel out the voting strength of this minority group; and that redistricting Marion County alone would leave impermissible variations between Marion districts and others in the State, thus requiring statewide redistricting, which could not await 1970 census figures. This court further held the statutes unconstitutional, and gave the State until October 1, 1969, to enact reapportionment legislation. No such legislation ensued, and this court drafted a plan using single-member districts throughout the State. The 1970 elections were ordered to be held in accordance with the new plan. The Supreme Court granted a stay of judgment pending final action on the appeal, thus permitting the 1970 elections to be held under the condemned statutes. Under those statutes, based on the 1960 census, there was a maximum variance in population of senate districts of 28.20%, with a ratio between the largest and smallest districts of 1.327 to 1, and a maximum variance in house districts of 24.78%, with a ratio of 1.279 to 1.

Mr. Justice White delivered the opinion of the Supreme Court with respect to Parts I–VI, finding that:

1. Although, as the Court was advised on June 1, 1971, the Indiana legislature enacted new apportionment legislation providing for statewide single-member house and senate districts, the case was not moot. Pp. 140–141.

2. The validity of multi-member districts was justiciable, but a challenger has the burden of proving that such districts unconstitutionally operate to dilute

or cancel the voting strength of racial or political groups. Pp. 141–144.

3. The actual, as distinguished from theoretical, impact of multi-member districts on individual voting power has not been sufficiently demonstrated on the record to warrant departure from prior cases involving multi-member districts, and neither the findings below nor the record sustains the view that multi-member districts overrepresent their voters as compared with voters in single-member districts, even if the multi-member legislative delegation tends to bloc voting. Pp. 144–148.

4. Appellees claim that the fact that the number of ghetto residents who were legislators was not proportionate to ghetto population proves invidious discrimination, notwithstanding the absence of evidence that ghetto residents had less opportunity to participate in the political process, was not valid, and on the record the malproportion was due to the ghetto voters' choices losing the election contests. Pp. 148–155.

5. The trial court's conclusion that, with respect to their unique interests, ghetto residents were invidiously underrepresented due to lack of their own legislative voice, was not supported by the findings. Moreover, even assuming bloc voting by the county delegation contrary to the ghetto majority's wishes, there was no constitutional violation, since that situation inheres in the political process, whether the district be single- or multi-member. P. 155.

6. Multi-member districts have not been proved inherently invidious or violative of equal protection, but, even assuming their unconstitutionality, it was not clear that the remedy was a single-member system with lines drawn to ensure representation to all sizable racial, ethnic, economic, or religious groups. Pp. 156–160.

7. The trial court erred in brushing aside the entire state apportionment policy without solid constitutional and equitable grounds for doing so, and without considering more limited alternatives. Pp. 160–161.

Mr. Justice White, joined by The Chief Justice, Mr. Justice Black, and Mr. Justice Blackmun, concluded, in Part VII, that it was not improper for this court to order statewide redistricting on the basis of the excessive population variances between the legislative districts shown by the record. That the trial court ordered reapportionment not because of population shifts since its 1965 decision upholding the statutory plan but because the disparities had been shown to be excessive by intervening decisions of the Supreme Court. Pp. 161–163.

Mr. Justice Douglas, joined by Mr. Justice Brennan and Mr. Justice Marshall, concluded, with respect to redistricting the entire state, that there were impermissible population variances between districts under the current apportionment plan, and that the new Marion County districts would also have impermissible variances, thus requiring statewide redistricting. Pp. 179–180.

Following the Supreme Court's remand for further proceedings consistent with its opinion, David Grindstaff filed a petition to intervene as party plaintiff, and defendant, Edgar D. Whitcomb, Governor of Indiana and Chairman of the State Election Board, filed motions to dismiss and to strike. These three matters are presently pending before this court for consideration.

The three-judge court having fully considered the opinion of the Supreme Court; the motion to dismiss, the petition to intervene and the motion to strike; the briefs in support thereof and in opposition thereto, and being duly advised in the premises, concludes:

■ I. The motion of defendant to dismiss this cause of action for lack of jurisdiction over the subject matter should be, and it is, hereby granted.

Even though the Supreme Court considered the matter of mootness in its opinion, 403 U.S. 124, 140–141, 91 S.Ct.

1858, 29 L.Ed.2d 363, and declined to order dismissal on that ground, this court finds that the case is moot, as it now stands on remand.

The central issues in the case were, first, the plaintiffs' claim that the State's legislative apportionment statutes establishing Marion County as a multi-member district for the election of state senators and representatives invidiously diluted the votes of Negroes and poor persons living in the "ghetto area" of Marion County, and, second, that voters in multi-member districts were overrepresented since the true test of voting power is the ability to cast a tie-breaking vote, and the voters in multimember districts had a greater theoretical opportunity to cast such votes than voters in single-member districts. These central issues, which apparently prompted the Supreme Court to hold as it did on the matter of mootness, are no longer questions for this court to consider because (1) the remaining named plaintiff, a resident of the "ghetto area," has not purported that he seeks to offer, nor has he offered, additional evidence that voters residing in the "ghetto area" suffer a dilution of their voter-strength by reason of the 1965 or 1972 Reapportionment Acts, and (2) the Supreme Court decided that neither the findings by this court nor the record on appeal sustained the plaintiffs' claims.

■ The so-called "amended complaint" is a tendered complaint filed by the petitioner to intervene, and the status of this case must first be determined without reference to his allegations.

Further, regarding the court's retention of jurisdiction, the court did not intend to establish itself as the permanent overseer of all future apportionment plans, but rather intended to establish two limiting critria by "The Court's Plan and Order for Reapportionment of the Legislative Seats In the General Assembly of Indiana," dated December 15, 1969. [Hereinafter called "Plan and Order."] These criteria for retaining

jurisdiction were, first, only if the original plaintiffs or at least their class of "ghetto area" residents made the challenge, and second, only if the legislation on reapportionment resulted "by reason of" the court's Plan and Order.

This court, only after the General Assembly of Indiana declined to act, drafted the Plan and Order, supra, using single-member districts throughout the State. Both "the question of how the 'holdover' senators shall be treated," and the desire of the court to protect the constitutional rights of the constituents of "holdover" senators, provided the matrix for the court to retain jurisdiction over a limited subject matter. This court discussed at length its considerations for retaining jurisdiction in its December 15, 1969, Plan and Order:

"The single-member district plan gives recognition *to the cognizable racial minority group whose grievance lead to this litigation.*

"In reapportioning legislative seats in the General Assembly, the question of how the 'holdover' senators shall be treated is presented.

"The Constitution of the State of Indiana, Art. 4, Sec. 3, provides that senators are elected for 4-year terms; thus, theoretically half of the members of the Senate, those who were elected in the 1968 general election, would not stand for re-election in 1970. Since the Act under which they were elected has been found unconstitutional, the Court is required to determine what is to become of the remainder of their terms of office. To permit the present terms of incumbent senators to extend beyond the 1970 general election would prevent implementation of the districting plan herein prescribed. Senators elected in 1968 under what has now been declared to be an unconstitutional statute do not have a vested right to serve out the balance of their 4-year terms. Reynolds v. State, 233 F.Supp. 323 (W.D.Okl. 1964). Thus the Court has concluded

that it will be necessary to fill all fifty senatorial seats in the 1970 election, and that the present terms of all incumbent senators will expire at the time the members of the newly elected legislature take office on January 7, 1971. Mann v. Davis, 238 F.Supp. 458 (E.D.Va.1964), aff'd [Hughes v. W. M. C. A.] 379 U.S. 694 [85 S.Ct. 713, 13 L.Ed.2d 698] (1965); Hughes v. WMCA, Inc., 379 U.S. 694 [85 S.Ct. 713, 13 L.Ed.2d 698] (1965); Holt v. Richardson, 238 F.Supp. 468 (D.Haw. 1965); People ex. rel. Engle v. Kerner, 33 Ill.2d 11, 210 N.E.2d 165 (1965).

"The Indiana constitutional provision for staggering the terms of senators, so that one-half of the Senate terms expire every two years, is entirely proper and valid and would be mandatory in a legislatively devised redistricting plan.

"However, the plan adopted herein is *provisional in nature and probably will be applicable for only the 1970 election and the subsequent 2-year period.* This is true since the 1970 census will have been completed in the interim, and the legislature can very well redistrict itself prior to the 1972 election.

\* \* \* \* \* \*

"The Court retains jurisdiction of this action for the purpose of passing upon any future claims of unconstitutionality *made by plaintiffs* against any future legislative apportionment adopted by the General Assembly of Indiana *by reason of this order.* . . ."

Chavis, et al. v. Whitcomb, No. IP 69–C–23,

"The Court's Plan and Order for Reapportionment of the Legislative Seats In the General Assembly of Indiana," December 15, 1969, pp. 8–10.

[Emphasis added.]

Clearly, this court's Plan and Order did not, by establishing two limiting criteria for retaining jurisdiction, convert itself into a permanent overseer of Indiana apportionment.

II. The petition of David Grindstaff to intervene under Rule 24 of the Federal Rules of Civil Procedure should be, and it is, hereby denied.

■ Intervention contemplates an existing lawsuit and cannot be permitted to breathe life into a non-existent suit. United States ex rel. Texas Portland Cement Co. v. McCord, 233 U.S. 157, 34 S.Ct. 550, 58 L.Ed. 893 (1914); Hofheimer v. McIntee, 179 F.2d 789 (7th Cir. 1950), cert. denied, Johnston v. McIntee, 340 U.S. 817, 71 S.Ct. 47, 95 L.Ed. 600 (1950).

Contrary to the petitioner's contention, this court did not retain jurisdiction over *all* future challenges to Indiana apportionment. *See* discussion I. *supra.*

This court takes judicial notice of the pendency of another action, filed since the remand of this case, in which the relief sought by the petition to intervene in this case is also sought in that case. Kenneth H. Wilson, et al. v. Edgar D. Whitcomb, No. IP 72–C–463, September 29, 1972.

III. By reason of the court's granting the motion to dismiss, the motion of defendant to strike the petitioner's "amended complaint" for failure to comply with the requirements of Rule 24 of the Federal Rules of Civil Procedure is moot, and therefore it should be, and it is, hereby denied. The court takes note that the defendant in his reply brief dated May 22, 1972, acknowledged that the petitioner had filed a petition to intervene and therefore defendant's motion to strike was without merit.